STARK, P.J.[1]
¶1 C.M.L. appeals an order for his involuntary WIS. STAT.ch. 51 commitment. He argues Marathon County failed to present sufficient evidence to prove that he was dangerous to himself or others under WIS. STAT.§ 51.20(1)(a)2. We disagree and affirm.
BACKGROUND
¶2 The circuit court entered an order finding that probable cause existed to temporarily detain C.M.L. after law enforcement filed a statement of emergency detention. Shortly thereafter, the court held a final hearing for involuntary civil commitment, where two court-appointed examiners, psychologist James Black and psychiatrist Leslie Taylor, testified.
¶3 Doctor Black interviewed C.M.L. at the Veterans Affairs ("V.A.") hospital in Madison. He testified that C.M.L. initially appeared "somewhat irritated" when Dr. Black introduced himself, but C.M.L. nonetheless agreed to speak to him. However, Dr. Black testified that his interview with C.M.L. was brief because "within a few moments" of asking him questions, C.M.L. stated that he did not want to continue the interview. Doctor Black diagnosed C.M.L. with treatable schizoaffective disorder. Due to the short interview with C.M.L., Dr. Black testified that his diagnosis was based primarily upon his review of C.M.L's V.A. hospital records. Doctor Black further opined that C.M.L. met the "fifth standard" for dangerousness to himself, referring to WIS. STAT . § 51.20(1)(a) 2.e., because C.M.L. demonstrated "a history of doing well on medication, and through lack of insight or other issues [was] declining to take them."
¶4 Doctor Taylor testified that she conducts "probably two or three court evaluations per week," and that she has done WIS. STAT . ch. 51 independent evaluations for approximately twenty years. She also diagnosed C.M.L. with treatable schizoaffective disorder following her review of C.M.L's V.A. hospital records and her approximately fifteen-minute interview with C.M.L. at the V.A. hospital. During that interview, Dr. Taylor observed that C.M.L.
was agitated. His thought was unorganized and tangential, and he presented as very paranoid; very, very irritable. At one point he sort of screamed out the word "commitment," which frightened others on the unit, particularly the nursing staff. It frightened me. That's what ended up terminating the interview.
She further explained that "all of the nursing staff was very rattled by [C.M.L.]'s presence on the unit."
¶5 Doctor Taylor also testified that she felt personally threatened by C.M.L.'s behavior. She described that, in her interview with C.M.L.,
He [was] very suspicious and paranoid. He speaks in a very loud voice. As I said, he yelled at me, and it made me feel threatened, and so I left the room, at which point he followed me; went over to the window. I went into the nursing station, and he continued to kind of rant about all the unfair treatment that he has been given. Yes, I felt threatened, and I would not go into a room alone with him.
Doctor Taylor further testified that she "had the sense if [she] had persisted in [her] question[ing,] it could have risen to the level of bodily harm to [her]self."
¶6 Doctor Taylor opined that C.M.L. was "dangerous to himself or others because of his mental illness." She explained that C.M.L., while not suicidal, was dangerous to himself because "[h]e was noted to be banging his head on the wall while he was in the Marathon County Jail." Doctor Taylor also testified that C.M.L. "couldn't stay at the VA [hospital] because he was threatening," which, in part, formed a basis for her opinion that C.M.L. was "extremely threatening" to others.
¶7 The circuit court concluded the County met its burden of showing C.M.L. was a proper subject for WIS. STAT.ch. 51 involuntary commitment. The court first found that C.M.L. had a "treatable mental illness." The court then rejected Dr. Black's conclusion that C.M.L. was dangerous under "the fifth standard," see WIS. STAT.§ 51.20(1)(a) 2.e., because the court found that, based upon C.M.L.'s testimony, he could "appreciate the advantages and disadvantages of medication," making him "competent at this time on the issue of medication." Instead, the court determined that C.M.L. was "dangerous to himself or others." It based its determination predominantly on Dr. Taylor's experience interviewing C.M.L., but also on its own in-court observations that C.M.L. "act[s] in an aggressive way." The court thus concluded that there was a "legitimate and reasonable fear of [C.M.L.'s] violent behavior that rises to a level of substantial danger to others." The court then ordered C.M.L. involuntarily committed for six months. C.M.L. appeals his commitment order.
DISCUSSION
¶8 An involuntary civil commitment requires the petitioner to prove three elements by clear and convincing evidence: (1) that an individual is mentally ill; (2) that the individual is a proper subject for treatment; and (3) that the individual is dangerous within the meaning of one or more of the five statutory definitions of dangerousness in WIS. STAT.§ 51.20(1)(a) 2.a.-e. Sec. 51.20(1)(a), (13)(e). Review of a commitment order presents a mixed question of fact and law. See Outagamie Cty. v. Melanie L. , 2013 WI 67, ¶¶38-39, 349 Wis. 2d 148, 833 N.W.2d 607. The circuit court's findings of fact will not be set aside unless they are clearly erroneous. Id. , ¶38. We must accept reasonable inferences drawn from the facts available to the circuit court. Id. Applying those facts to the relevant statutory standard and interpreting the statute are questions of law that we review independently. Id. , ¶39.
¶9 C.M.L. concedes for the purpose of this appeal that the County proved he was mentally ill and a proper subject for treatment. Accordingly, the only issue on appeal is whether the County presented clear and convincing evidence of dangerousness. C.M.L. argues that he did not meet any of the five criteria for dangerousness under WIS. STAT.§ 51.20(1)(a)2. The County responds that the circuit court properly found C.M.L. met the criteria for dangerousness to others under § 51.20(1)(a) 2.b. and that we should affirm the court's decision on that basis.[2]
¶10 To meet its burden of proof, the County must present clear and convincing evidence that C.M.L.
[e]vidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.
See WIS. STAT.§ 51.20(1)(a) 2.b. A "substantial probability" in the context of a WIS. STAT.ch. 51 commitment is defined as "much more likely than not." See State v. Curiel , 227 Wis. 2d 389, 414, 597 N.W.2d 697 (1999). Additionally, our supreme court has previously found "threat" to mean "an indication of impending danger or harm." See Outagamie Cty. v. Michael H. , 2014 WI 127, ¶34, 359 Wis. 2d 272, 856 N.W.2d 603.
¶11 Doctor Taylor testified that she has over twenty years' experience conducting WIS. STAT.ch. 51 independent evaluations, averaging two to three interviews a week. Yet, Dr. Taylor testified that after only fifteen minutes interacting with C.M.L., she felt so threatened by his behavior that she not only needed to terminate the interview with him, but also immediately leave the room. Moreover, when she attempted to do so, C.M.L. followed her and continued to "rant" at her through a window. Doctor Taylor testified that she "had the sense if [she] had persisted in [her] question[ing,] it could have risen to the level of bodily harm to [her]self." Similarly, she testified that V.A. nursing staff were "frightened" and "rattled" by C.M.L.'s presence within the unit where he resided. Doctor Taylor further noted that C.M.L.'s behavior had been so disruptive that he could not even stay at the V.A. hospital because the staff there found him so threatening.
¶12 The circuit court implicitly found Dr. Taylor's testimony credible and consistent with its own observations of C.M.L.'s aggressive behavior. When the court acts as the finder of fact, it is the ultimate arbiter of witness credibility. Village of Big Bend v. Anderson , 103 Wis. 2d 403, 410, 308 N.W.2d 887 (Ct. App. 1981). We will defer to the circuit court in both its express and implicit credibility determinations. Jacobson v. American Tool Cos. , 222 Wis. 2d 384, 390, 588 N.W.2d 67 (Ct. App. 1998). C.M.L. offered no contradictory evidence at the hearing concerning the interview with Dr. Taylor and its aftermath, and he makes no argument that the court's findings are clearly erroneous. Based upon the court's factual findings and credibility determinations, we agree with the court that C.M.L. evidenced a substantial probability of physical harm to others under WIS. STAT.§ 51.20(1)(a) 2.b. because the County presented clear and convincing evidence that C.M.L.'s conduct placed Dr. Taylor in reasonable fear of violent behavior and serious physical harm.
¶13 C.M.L. argues his behavior was not threatening enough to be considered dangerous under WIS. STAT.§ 51.20(1)(a) 2.b. for three reasons. First, he contends there was no evidence of a verbal threat, distinguishing his case from R.J. v. Winnebago County , 146 Wis. 2d 516, 431 N.W.2d 708 (Ct. App. 1988). He also contends there was no overt act on his part indicating there was a substantial probability of harm to others because he did not use or possess a weapon like the respondent's hidden knife in S.Y. v. Eau Claire County , 156 Wis. 2d 317, 457 N.W.2d 326 (Ct. App. 1990), aff'd , 162 Wis. 2d 320, 469 N.W.2d 836 (1991). However, C.M.L.'s reliance on these cases is unpersuasive. They do not hold that a person cannot be found dangerous under § 51.20(1)(a) 2.b. if those facts are not present. For that reason, C.M.L. cites no legal authority for his proposition that a person cannot be found dangerous under § 51.20(1)(a) 2.b. absent a direct verbal threat, or the use or possession of a weapon.
¶14 Second, C.M.L. argues his behavior was similar to that of the respondent in Milwaukee County v. Cheri V. , No. 2012AP1737, unpublished slip op. ¶7 (WI App Dec. 18, 2012). In Cheri V. , the circuit court ordered Cheri V.'s commitment based upon a nurse's testimony describing Cheri V.'s proximity to a male peer at a mental health facility, while shaking and pointing her finger at him and becoming agitated. Id. , ¶3. We reversed, concluding that there was no evidence any of the statutory prerequisites for dangerousness were met. Id. , ¶7. C.M.L. contends his yelling the word "commitment" loudly and "complaining about unfair treatment [because of his] frustration with being confined in the hospital" is similar behavior that does "not rise to the level of an overt act" that would "much more likely than not" lead to violent behavior and serious physical harm.
¶15 However, C.M.L.'s reliance on Cheri V. is misplaced. The circuit court in that case made no findings of fact in connection with whether Cheri V. was dangerous. Id. , ¶5. We therefore reviewed the record de novo and concluded that yelling and finger pointing, without more, was insufficient to meet any of the statutory prerequisites. Id. , ¶¶5, 7. In contrast, the facts here support the court's finding that while interviewing C.M.L., Dr. Taylor felt threatened and was reasonably concerned that C.M.L. was violent and would cause her serious physical harm. C.M.L.'s overt acts of screaming the word "commitment" during his interview and following Dr. Taylor as she left the interview room-while continuing to rant about his unfair treatment-coupled with his loud tone and aggressive, irritable demeanor evidenced a threat of impending physical danger or harm to Dr. Taylor.
¶16 Third, C.M.L. parses Dr. Taylor's testimony to argue that each individual aspect of his behavior was not, in and of itself, serious enough to be considered threatening. However, when considering the entirety of the circumstances, the circuit court clearly believed Dr. Taylor considered C.M.L.'s behavior as "an indication of impending danger or harm" to her and that she was placed in reasonable fear of violent behavior and serious physical harm as a result of that threatening behavior. See Michael H. , 359 Wis. 2d 272, ¶34. Applying the court's findings to the law, we conclude that C.M.L. evidenced a substantial probability of physical harm to others as defined in WIS. STAT.§ 51.20(1)(a) 2.b.
By the Court. -Order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)4.

This appeal is decided by one judge pursuant to Wis. Stat. § 752.31(2)(g) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

On appeal, we may affirm on different grounds than those relied on by the circuit court. See Vanstone v. Town of Delafield , 191 Wis. 2d 586, 595, 530 N.W.2d 16 (Ct. App. 1995). However, the County does not argue that C.M.L. meets any of the other criteria for dangerousness, and the record lacks clear and convincing evidence that would permit us to find that C.M.L. meets those criteria. Accordingly, our discussion focuses solely on whether the County met its burden to present clear and convincing evidence that C.M.L. is dangerous to others under Wis. Stat. § 51.20(1)(a) 2.b.