**COURT OF APPEALS
DECISION
DATED AND FILED**

**January 20, 2023**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| | |
|---|---|
| **Appeal No.**     **2022AP1585-FT** | **Cir. Ct. No. 2014ME98** |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS DISTRICT IV** |

IN THE MATTER OF THE MENTAL COMMITMENT OF H.V.:

ROCK COUNTY,

    PETITIONER-RESPONDENT,

  V.

H. V.,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Rock County: DANIEL T. DILLON, Judge. *Affirmed.*

¶1 NASHOLD, J.[1] H.V. appeals an order extending his WIS. STAT. ch. 51 commitment. He argues that the order should be reversed because the

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). In an October 18, 2022 order, the court placed this case on the expedited appeals calendar, and the parties have submitted memo briefs. *See* WIS. STAT. RULE 809.17. Briefing was completed

(continued)

circuit court relied on hearsay testimony for its conclusion that H.V. is currently dangerous. He further argues that the evidence is insufficient to demonstrate dangerousness. I reject these arguments and affirm the court's order.

## BACKGROUND

¶2 H.V. has been under continuous WIS. STAT. ch. 51 commitment in Rock County since 2014, and prior to that, has had commitments in Rock and Marathon Counties. It is undisputed[2] that H.V. has schizophrenia resulting in delusional and paranoid thinking, and that he lacks insight into his mental illness. At the time of the hearing in this matter, H.V. was receiving outpatient treatment through the Janesville Community Support Program (CSP), and was taking antipsychotic medication pursuant to a court order.

¶3 In December 2021, Rock County petitioned to extend H.V.'s commitment. At the extension hearing in February 2022, the County called two witnesses, Dr. James Black and Dr. Leslie Taylor. Their reports were also admitted into evidence. Both witnesses recommended an extension of H.V.'s involuntary commitment order.

¶4 Dr. Black met with H.V. in February 2022, and on two prior occasions, in January and December 2018. In preparing his report, Dr. Black also reviewed CSP records and consulted with CSP staff. He testified, to a reasonable degree of medical certainty, that if treatment were withdrawn, H.V. would become

---

on December 21, 2022. All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] Although the record indicates that H.V. himself does not believe he has a mental illness or any psychiatric symptoms, his attorney does not dispute their existence on appeal.

a proper subject for commitment, "without question." He based this belief in part on the fact that the last time H.V.'s commitment was extended without an order to treat in December 2016, H.V. "immediately stopped his medications, decompensated, and ultimately ended up hospitalized." This has been a "pattern" since at least the commitments in Rock County. Dr. Black testified that when he asked H.V. if he would take medications without a court order, H.V. responded, "Probably not."

¶5 Dr. Black further testified that, due to H.V.'s mental illness, H.V. had a history of hospitalizations dating back to the early 2000s. Based on H.V.'s history, the particular factors associated with his schizophrenia and his lack of insight, Dr. Black opined that there is a substantial probability that if treatment were withdrawn, H.V. would decompensate, have a reemergence of psychiatric symptoms, and become a danger to himself and others. He also testified that "there's a substantial certainty that stopping medications would create a state of mind and concomitant dangerousness due to his mental illness."

¶6 When asked in what way H.V. would become a danger to himself and others, Dr. Black testified that H.V.'s history shows that he becomes "extremely paranoid" and has delusions that "tend to be less spontaneous and less distinct when he is on medication." He testified that the delusions "never actually go away, but they appear to be more manageable when he's treated," and that without medications, "[H.V.] can't manage that, and has a history of acting out." The medications "seem to push [the delusions] into the background [and] make them less intrusive and more manageable." When on medications, although H.V. "may have some of those thoughts[, he] doesn't feel compelled to act on them." Dr. Black testified that when there is a court order, H.V. seems to be compliant with continuing treatment; Dr. Black believes H.V. has been compliant after 2016

3

because of the court order and "the fact that he's working closely with a structured community-based program who often reminds him he is under a court order." Dr. Black did not believe that H.V. would continue to take advantage of that community program without a court order.

¶7    Dr. Taylor testified that H.V. declined to meet with or talk to her for the preparation of her report in the current extension proceeding. However, she had previously met with him in 2014 and 2020. She also reviewed her prior reports and records from Rock County, including doctor notes and a crisis plan, and spoke with H.V.'s case manager. Dr. Taylor testified that there is a substantial likelihood that if treatment were withdrawn, H.V. would become a proper subject for commitment. She testified that in 2016, when not on a court order to take medication, H.V. promptly stopped taking his medication, decompensated, became delusional, "and was unable to … maintain his safety in the community."[3] Dr. Taylor opined to a reasonable degree of psychiatric certainty that there was a substantial likelihood that if treatment were withdrawn, H.V. would be a danger to himself or others.

¶8    When asked in what way H.V. would be a danger, Dr. Taylor began testifying about H.V.'s "paranoid thinking" that led to a felony charge. Counsel for H.V. objected and the circuit court overruled the objection, and further stated that it would take "judicial notice" of the following: H.V.'s judgment of conviction, based on a guilty plea of aggravated battery with intent to do bodily

---

[3] Dr. Taylor began testifying to a specific incident that occurred during that time period, in which H.V. "left a car on the side of the road" and "[h]ad a cigarette on his lap." However, following a hearsay objection, counsel for the County agreed to strike that testimony and the circuit court therefore agreed to disregard it. I do not consider this information in reaching my decision in this matter.

harm; that the judgment of conviction was entered June 21, 2018; that the Information states that the offense took place on February 5, 2016; and that in the plea questionnaire and waiver of rights form in the court file, signed by H.V., H.V. states that the elements were explained to him and that he is aware of the elements of the offense. The court stated: "That's as far as I'm going to go on this point."

¶9    Continuing her testimony, Dr. Taylor testified that the 2016 assault "was because of paranoid thinking that this person at the bar was having sex with an ex-wife" and that H.V.'s belief that he had to protect his ex-wife was a "delusion," "not based in reality, and "a symptom of his mental illness."[4] She testified that the 2016 assault occurred after H.V. had stopped taking his medication. Dr. Taylor could not recall whether she discussed the 2016 incident with H.V. during her 2020 meeting with him. She further testified, "So the concern is that if the medications were to be stopped, that the delusional thinking ... sort of kept at bay would again become more prominent" and he would not be able to "recognize these thoughts as something that he does not need to act on." H.V.'s counsel again objected to Dr. Taylor's testimony regarding the facts of the 2016 assault and the circuit court overruled the objection, stating that it would also take judicial notice of the complaint in that case and the plea hearing, at which H.V. stated that he did not agree with every statement in the criminal complaint but he agreed that there was an altercation.[5]

---

[4] When asked if she was aware of whether H.V. ever had a wife, Dr. Taylor responded, "Not that I'm aware of or that I could read in the records." The parties do not discuss this statement on appeal and I therefore do not consider it.

[5] H.V.'s attorney also generally objected to "hearsay evidence" in the two medical reports, without specifying what hearsay formed the basis of his objection. The circuit court did not specifically rule on this objection. Because the conclusions in this opinion are based on the testimony presented at the hearing and not on the reports, I do not consider this issue further.

¶10    Dr. Taylor testified that H.V. is a proper subject for treatment because he has done well with CSP services available to him, the medications, and "the support that surrounds the medications."  It was "clear" to Dr. Taylor from her review of the records that H.V. does not believe he is mentally ill and that he would stop taking medications if he were given the opportunity to do so.  She "recommended commitment to help him to stay safely in the community."

¶11    The circuit court extended H.V.'s commitment for twelve months, stating that it was doing so under the "second standard" of dangerousness.  *See* WIS. STAT. § 51.20(1)(a)2.b.[6]  Because the County did not request a separate involuntary medication order due to Dr. Taylor's inability to conduct a "medication review" with H.V., the court did not issue an involuntary medication order.  The court did, however, order the "standard conditions" of commitment, one of which is for H.V. to take his psychotropic medications as prescribed.  The court's reasoning is discussed in more detail below.

## DISCUSSION

### *I. General Legal Principles and Standards of Review*

¶12    A county initiating a WIS. STAT. ch. 51 involuntary commitment must prove, by clear and convincing evidence, that the subject individual is: (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous under one of

---

[6] Although at the hearing, the circuit court referenced only the second standard, the court's extension order checks the boxes for both the second and third standards.  Because it is necessary that the County satisfy only one standard, I analyze the second standard only, while noting that the evidence presented likewise satisfied the third standard.  *See* WIS. STAT. § 51.20(1)(a)2.c. (an individual is dangerous under the third standard where he or she "[e]vidences such impaired judgment ... that there is a substantial probability of physical impairment or injury to himself or herself or other individuals").

five statutory standards set forth in WIS. STAT. § 51.20(1)(a)2.a.-e. ***Portage County v. J.W.K.***, 2019 WI 54, ¶17, 386 Wis. 2d 672, 927 N.W.2d 509; § 51.20(1)(a), (13)(e). Pursuant to subd. para. 2.b., the standard at issue here, an individual is dangerous when he or she "[e]vidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm." Sec. 51.20(1)(a)2.b.

¶13 An extension proceeding requires proof by clear and convincing evidence of the same three elements, "except that instead of proving dangerousness under [WIS. STAT.] § 51.20(1)(a)2.a.-e., the [C]ounty may rely on the 'alternative evidentiary path' of § 51.20(1)(am)." ***Winnebago County v. S.H.***, 2020 WI App 46, ¶8, 393 Wis. 2d 511, 947 N.W.2d 761 (quoting ***J.W.K.***, 386 Wis. 2d 672, ¶19); § 51.20(13)(g)3. Paragraph (am) "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior." ***J.W.K.***, 386 Wis. 2d 672, ¶19. Therefore, in proving dangerousness under subd. para. 2.b. in an extension proceeding, "the requirement[] of a recent overt act, attempt or threat to act … may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." Sec. 51.20(1)(am).

¶14 "Review of an extension order presents a mixed question of fact and law." ***S.H.***, 393 Wis. 2d 511, ¶10. The appellate court upholds factual findings unless they are clearly erroneous, but it reviews de novo whether those facts satisfy the statutory standard for recommitment. ***Id.***

7

## II. Application to H.V.'s Appeal

¶15    H.V. raises two issues on appeal.  First, he argues that the circuit court improperly relied on what he asserts is hearsay testimony from Dr. Taylor regarding the 2016 assault.  Second, he argues that the evidence presented does not support the requisite finding of dangerousness.  I address and reject these arguments, in turn.

A.  Hearsay

¶16    H.V. argues that the circuit court impermissibly relied on hearsay testimony from Dr. Taylor regarding the 2016 assault.  As stated, Dr. Taylor testified that H.V.'s conduct led to a felony charge, that the conduct "was because of paranoid thinking that this person at the bar was having sex with an ex-wife," that H.V. believed he had to protect his ex-wife, but that this belief was a "delusion," "not based in reality," and "a symptom of his mental illness."

¶17    Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  WIS. STAT. § 908.01(3).  In support of his hearsay argument, H.V. relies primarily on *S.Y. v. Eau Claire County*, 156 Wis. 2d 317, 457 N.W. 326 (Ct. App. 1990), in which this court stated, "While experts may rely on inadmissible evidence in forming opinions, sec. 907.03, Stats., the underlying evidence is still inadmissible."  *Id.* at 327.

¶18    In response, the County focuses on the circuit court's statement that it was "limiting the references to past events by Dr. Taylor to the circumstance in the criminal conviction for which, at least the elements of the offense were admitted, and nothing beyond that."  The County also argues—and H.V. does not

8

dispute—that the judgment of conviction for the 2016 assault was admissible under WIS. STAT. § 908.03(22). This provision provides a hearsay exception for "[e]vidence of a final judgment, entered after a trial or upon a plea of guilty, but not upon a plea of no contest, adjudging a person guilty of a felony as defined in [WIS. STAT. §§] 939.60 and 939.62(3)(b), to prove any fact essential to sustain the judgment …." Sec. 908.03(22).

¶19     As noted above, however, the circuit court also stated that it took judicial notice of the following: (1) H.V.'s June 21, 2018 judgment of conviction, based on a guilty plea of aggravated battery with intent to do bodily harm; (2) the criminal complaint in that case; (3) that the Information shows that the offense took place on February 5, 2016; (4) that in the plea questionnaire and waiver of rights form, signed by H.V., H.V. states that the elements were explained to him and that he is aware of the elements of the offense; and (5) the plea hearing, at which H.V. stated that he did not agree with every statement in the criminal complaint but agreed that there was an altercation.

¶20     In addition, in explaining its reasoning for extending H.V.'s commitment, the circuit court stated that because of H.V.'s paranoia, H.V. has in the past "fe[lt] the need to … lash out to protect someone." The court continued, "Whether that person existed or not, he became paranoid, there was an injury. And both of the doctors are absolutely clear that without the medication,… what has happened is going to happen again." The court stated that H.V.'s schizophrenia "brings out paranoia" and that there was a risk that H.V. "would hurt someone else in a delusional view that he needs to protect a third-party who may or may not even exist and doesn't need to be protected even if they did exist, and the innocent victim would be the third party injured or the other party

9

injured." The court also stated that "the danger could be to [H.V.] because a person who he might assault would retaliate to protect [him or herself]."

¶21 In light of these statements by the circuit court, I assume that, contrary to the County's suggestion, the court relied to some degree on Dr. Taylor's testimony regarding the circumstances of the 2016 assault. However, for the reasons that follow, I nevertheless reject H.V.'s hearsay argument.

¶22 As stated above, H.V. does not dispute that the judgment of conviction itself was admissible under WIS. STAT. § 908.03(22). Likewise, H.V. does not challenge the circuit court's taking judicial notice of the documents set forth above and the specific facts contained in the documents that the court referenced. Thus, H.V.'s only argument on appeal is that the court impermissibly relied on Dr. Taylor's testimony that the 2016 assault "was because of paranoid thinking that this person at the bar was having sex with an ex-wife," that H.V. believed he had to protect his ex-wife, but that this belief was a "delusion," "not based in reality," and "a symptom of his mental illness."

¶23 Significantly, H.V. does not offer any evidence or a developed argument to support his assertion that Dr. Taylor's testimony is inadmissible hearsay. His argument consists merely of the following assertions: Dr. Taylor has "no first-hand knowledge of this conviction, she has had limited personal contact with H.V., and the [C]ounty failed to present any authenticated records that state the actual factual basis for the conviction, let alone a link to H.V.'s mental illness." As a preliminary matter, I reiterate that the circuit court took judicial notice of the judgment of conviction for the 2016 assault, as well as the criminal complaint and plea hearing in that case, and that H.V. has not challenged the court's actions in that regard. Thus, the court presumably had before it significant

10

information about that offense. Putting aside that important fact, H.V.'s assertions do not constitute a developed argument that Dr. Taylor's testimony is inadmissible hearsay.

¶24 As to Dr. Taylor's testimony regarding the circumstances of the 2016 assault—*i.e.*, that the assault occurred in a bar, that H.V. believed that the victim was having sex with his ex-wife, and that H.V. believed he needed to protect his ex-wife—H.V. makes no attempt to describe what the source of Dr. Taylor's information was or why her testimony on these points is hearsay. Dr. Taylor testified that she did not recall whether she discussed the 2016 assault with H.V. when she met with him in 2020. She did not testify further regarding the source for her information about the 2016 assault, nor did H.V.'s counsel seek to elicit such information. (In fact, H.V.'s counsel did not question Dr. Taylor at all, declining to cross-examine her.) Without such information, this court is unable to determine whether the testimony at issue constitutes hearsay, or, assuming it is hearsay, whether a hearsay exception might apply.

¶25 The same is true of Dr. Taylor's testimony that H.V.'s beliefs leading to his commission of the 2016 assault were based on "paranoid thinking" and "delusion," were "not based in reality," and were "a symptom of his mental illness." H.V. does not develop an argument as to why Dr. Taylor's expert opinion on these points is hearsay. He does not question Dr. Taylor's credentials as an expert in the area of psychiatry, nor does he offer any evidence as to the source of Dr. Taylor's opinions so that a reviewing court may determine whether her testimony on these points constitutes hearsay. Accordingly, I decline to consider H.V.'s undeveloped argument that the circuit court impermissibly relied on hearsay in reaching its decision. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we need not address undeveloped arguments).

B. Sufficiency of the Evidence

¶26    H.V. argues that, even with Dr. Taylor's purported hearsay testimony, the County presented insufficient evidence to support the circuit court's determination of dangerousness under the "second standard," WIS. STAT. § 51.20(1)(a)2.b.    As pertinent here, the County had to present clear and convincing evidence that, if treatment were withdrawn, H.V. would evidence "a substantial probability of physical harm to other individuals" as manifested by "homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them." *See* § 51.20(1)(a)2.b., (am), (13)(e).

¶27    I conclude that the County met this burden.    As discussed above, Dr. Black testified that if treatment were withdrawn, H.V. would become a proper subject for commitment, "without question."    He testified that when H.V.'s commitment was extended without an order to treat in December 2016, H.V. "immediately stopped his medications, decompensated, and ultimately ended up hospitalized" and that this has been a "pattern" since at least the commitments in Rock County.    He testified that when he asked H.V. if he would take medications without a court order, H.V. responded, "Probably not."

¶28    Dr. Black opined that, based on H.V.'s history, the particular factors associated with H.V.'s schizophrenia, and H.V.'s lack of insight, there is a substantial probability that if treatment were withdrawn, H.V. would decompensate, have a reemergence of psychiatric symptoms, and become a danger to himself and others.    Based on these same factors, he further testified that "there's a substantial certainty that stopping medications would create a state of mind and concomitant dangerousness due to his mental illness."    According to

12

Dr. Black, H.V.'s delusions "tend to be less spontaneous," "more manageable" and "less intrusive" when he is on medication and that without medications, H.V. "has a history of acting out."

¶29    Dr. Taylor likewise testified that there is a substantial likelihood that if treatment were withdrawn, H.V. would become a proper subject for commitment and would become a danger to himself or others. She testified that in 2016, when not on a court order to take medication, H.V. promptly stopped taking his medication, decompensated, became delusional "and was unable to … maintain his safety in the community." She testified as to her belief that without medication, "the delusional thinking ... sort of kept at bay would again become more prominent" and he would not be able to "recognize these thoughts as something that he does not need to act on." It was "clear" to Dr. Taylor from her review of the records that H.V. does not believe he is mentally ill and that he would stop taking medications if he were given the opportunity to do so.

¶30    The circuit court credited the expert testimony of Drs. Black and Taylor. The court observed that both doctors agree that H.V.'s "baseline" involved paranoia, that H.V.'s medication "makes the symptomology more controlled" and that "when [H.V.] takes his medication, his paranoia is less distinct" and "more manageable." As to dangerousness, the court emphasized Dr. Black's testimony "that if treatment were withdrawn, there would be a substantial certainty, not a probability, a substantial certainty, that [H.V.] would be dangerous, because absent medication, his state of mind would be impaired. His dangerousness would increase, and it would … be due to his mental illness." Referencing the 2016 assault, the court commented that because of H.V.'s paranoia, in the past, he has "fe[lt] the need to … lash out to protect someone." The court continued, "Whether that person existed or not, he became paranoid,

there was an injury. And both of the doctors are absolutely clear that without the medication,… what has happened is going to happen again." The court noted that H.V.'s schizophrenia "brings out paranoia as opposed to schizophrenia in which he has some other altered view of reality which is harmless." The court further stated:

> This is not harmless. This is harmful. And the risk is, under the second standard, that he would hurt someone else in a delusional view that he needs to protect a third-party who may or may not even exist and doesn't need to be protected even if they did exist, and the innocent victim would be the third party injured or the other party injured. And there's a possibility the danger could be to himself because a person who he might assault would retaliate to protect [him or herself].… Dr. Black believes that … with the medication, [H.V.]'s dangerousness is controllable; and without the medication [order], he's not going to take it on his own, he has said he won't take it on his own, and he lacks insight; he would stop the treatment and would become the subject of the commitment over again because he becomes dangerous to others. The doctors are absolutely clear on that. And they don't hesitate on those opinions.

¶31    Similarly, in discussing Dr. Taylor's opinions, the circuit court observed:

> Now, Dr. Taylor doesn't know exactly what happened in the aggravated battery in 2016, but there was one, and there was bodily harm done, and she connects it to paranoid thinking … to something that arises and is exaggerated and exacerbated when [H.V.] isn't taking his medication. And she is of the opinion, the medical opinion, that were his medication stopped and were he to stop his medication, this would happen again.

H.V. has not shown that any of the circuit court's findings are clearly erroneous.

¶32    Finally, I note that although the expert testimony on dangerousness was often tied to H.V. not taking his medications and that the circuit court did not

issue an involuntary medication order, the court did order, as a condition of H.V.'s recommitment, that H.V. take the psychotropic medication prescribed to him. Both experts testified that H.V. is generally compliant with taking medications when under a court order. Dr. Black testified that H.V. has been compliant after 2016 because of the court order, and due to "the fact that he's working closely with a structured community-based program who often reminds him he is under a court order." He did not believe that H.V. would continue to take advantage of that community program without a court order. Similarly, Dr. Taylor testified that H.V. is a proper subject for treatment because he has done well with the CSP services available to him, the medications, and "the support that surrounds the medications." Thus, the absence of a separate involuntary medication order does not in any way undermine the conclusion that a twelve-month recommitment was appropriate.

¶33　Based on the foregoing, the circuit court properly concluded that the County met the statutory standard for dangerousness under the "second standard," WIS. STAT. § 51.20(1)(a)2.b.[7] Accordingly, I affirm the court's order extending H.V.'s WIS. STAT. ch. 51 commitment.

---

[7] H.V. argues that, if the evidence is deemed sufficient for recommitment in this case, he will be the "subject of a perpetual commitment" "so long as [he] remains mentally ill and treatable." This argument is predicated on H.V.'s assertion that his recommitment was based solely on H.V.'s delusions, his lack of insight into this mental illness, and the 2016 assault. But this argument misconstrues the basis for recommitment. H.V. was not recommitted based solely on this information but primarily because of the two experts' undisputed and informed opinions that without a recommitment order H.V. would not take his medication, would decompensate, and ultimately become dangerous.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.